UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
RAFAEL APACHE GONZALEZ,

                                  Plaintiff,

         -against-

LOCAL 52, INTERNATIONAL ALLIANCE OF
THEATRICAL STAGE EMPLOYEES, MOVING
PICTURE TECHNICIANS, ARTISTS AND ALLIED
CRAFTS OF THE UNITED STATES, ITS
TERRITORIES, AND CANADA, AFL-CIO, CLC;
JOHN FORD, PRESIDENT, LOCAL 52; RAYMOND
FORTUNE, BUSINESS REPRESENTATIVE, LOCAL
52; AND RICHARD TICE, PROPERTY
REPRESENTATIVE, LOCAL 52,

                                  Defendants.
------------------------------------------------------------------X

**COMPLAINT**

CIVIL ACTION NO.
_____

**DEMAND FOR JURY**

Plaintiff, Rafael Apache Gonzalez, by and through his attorneys, Levy Ratner, P.C., alleges the following against Defendants Local 52, International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada ("Local 52" or "Union"), John Ford, Raymond Fortune and Richard Tice:

## NATURE OF ACTION

This is an action brought to remedy unlawful employment practices by a labor organization and certain of its officers on the basis of national origin, race, and retaliation for opposition to unlawful practices in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, the New York State Human Rights Law, New York Executive Law §§ 290 et seq., and the New York City Administrative Code §§ 8-101, et seq. Plaintiff asserts that Defendants maintained policies and practices that had a disparate impact on the opportunities of Plaintiff and other Hispanics and persons of color to obtain Union membership, and also maintained practices that were intentionally

1

discriminatory on the basis of national origin, race and opposition to unlawful employment practices. Plaintiff seeks declaratory and injunctive relief, back and front pay, as well as compensatory and punitive damages.

## JURISDICTION AND VENUE

1. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), as well as 28 U.S.C. § 1367(a) for claims arising under the New York State and New York City Human Rights Laws, based on supplemental jurisdiction over claims that arise from a common nucleus of operative facts and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction appropriate.

2. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII, 42 U.S.C. § 1981 and the State and City Human Rights Laws. This action is founded on charges filed with the United States Equal Employment Opportunity Commission ("EEOC") by Plaintiff Gonzales on or about June 28, 2011. This lawsuit is commenced within ninety (90) days of Plaintiff's receipt of notice from the EEOC of his right to sue.

## IDENTIFICATION OF THE PARTIES

3. Plaintiff Rafael Apache Gonzalez ("Plaintiff" or "Gonzalez") is a Hispanic male of Puerto Rican and Dominican descent who sought and was denied membership in Local 52. He was born in Brooklyn, New York, is a citizen of the United States, and a former member of the United States Marine Corps.

4. Defendant Local 52 is a labor organization as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e (d) & (e) as well as the New York State

Human Rights Law (Executive Law § 292(3)) and New York City Human Rights Laws (NYC Admin. Code § 8-102(3)). Local 52 regularly conducts business in the State and City of New York. Geographically, its jurisdiction includes all of New York, New Jersey, Connecticut, Delaware and Pennsylvania (with the exception of the 50 mile radius around Pittsburgh). Local 52 is a signatory to contracts that cover the production of motion picture and television productions. Currently, its membership totals more than 3,600 persons. Its principal offices are located at 19-02 Steinway Street, Astoria, NY 11105.

5.  Defendant Local 52 is also an employment agency as defined by the New York State Human Rights Law (Executive Law § 292(2)) and New York City Human Rights Law (NYC Admin. Code § 8-102(2)). It regularly refers its members and other non-Union persons for job opportunities within the movie industry in New York City and elsewhere.

6.  Defendant John Ford was, during all times relevant herein, and continues to be, the President of Local 52. Ford participated in, and aided and abetted others in, the discriminatory and retaliatory acts complained of herein. He resides in Westbury, NY, within the jurisdiction of this Court.

7.  Defendant Raymond ("Ray") Fortune was, during all times relevant herein, and continues to be, the Business Representative of Local 52. Fortune participated in, and aided and abetted others in, the discriminatory and retaliatory acts complained of herein. He resides in Oakland Gardens, NY, within the jurisdiction of this Court.

8.  Defendant Richard ("Dick") Tice was, during all times relevant herein, and continues to be, the Property Representative of Local 52. Ford participated in, and aided and

abetted others in, the discriminatory and retaliatory acts complained of herein. He resides in Port Washington, NY, within the jurisdiction of this Court.

## STATEMENT OF THE FACTS

9. Plaintiff Gonzalez began working in the film and television industry in New York City area in or about March, 2006. He has worked as a set dresser in various motion picture and television productions, including "American Gangster," "Spiderman 2," "Bourne Identity," "Sex and the City," and "Law and Order SUV." A set dresser's duties include loading and unloading trucks, moving furniture and other set materials to the set location, placing set materials on the set and then removing them at the conclusion of the shoot.

10. Plaintiff Gonzalez performed set dresser duties at all times in a dependable and competent manner, meeting or exceeding the expectations for the job.

11. Gonzalez has also worked as a lead man or foreman on a number of film and television productions, including "I Hate Valentine's Day," "Fugly!," and "Royal Pains." A foreman acts as a first line supervisor of set dressers on certain productions and the lead man acts as a first or second line supervisor on productions.

12. The Motion Picture Industry Pension & Health Plans has recorded the following total time worked by Gonzalez on Local 52-related productions during the specified years: 2006—1,120 hours; 2007—1,548 hours; 2008—1,112 hours; 2009—1,260 hours; 2010—0 hours; 2011—67 hours; 2012—511 hours; 2012—129 hours.

13. Throughout the 2006—2014 period, Local 52 has maintained a stated policy of assigning work to Union members in preference to non-Union members. Local 52 refers to non-

Union members seeking work on Local 52 productions, such as Gonzalez, as "permit workers," and, pursuant to Local 52 policy, Local 52's officers and agents referred permit workers to jobs when Union workers were unavailable. During certain periods, permit workers obtained work by contacting lead men or foremen, but were subject to removal by Local 52 to be replaced by Local 52 members.

14.  Upon information and belief, Local 52's membership, including the membership of the Property Division which includes the set dressers, has been historically and continues to be predominantly white despite the fact that blacks and Hispanics are a majority of the workers in the applicable New York City labor market.

15.  Local 52 has maintained, and continues to maintain, exclusionary membership practices based upon race and national origin. Those practices have had a disparate impact upon the opportunities of Plaintiff and other persons of color to become Union members, and Local 52 has maintained those practices with the intent to exclude non-white and Hispanic applicants.

16.  Of the more than one-thousand members of Local 52's Property Division working in the New York City market, only a very small percentage is Hispanic or black. This number is far below the number that would be expected if Local 52 applied non-discriminatory standards for membership, given the large percentage of Hispanics and blacks in the New York City market. Non-Union workers employed in the New York City movie industry, such as the non-Union Property Assistants, with similar qualifications to the set dressers but who are much lower paid than set dressers, are predominantly Hispanic and black.

17.  Since at least 2006, the vast majority of work performed by Local 52 members residing in New York is performed within the five boroughs of New York City, where major

studios are located in Brooklyn and Queens and filming on location regularly occurs within the five boroughs.

18. The discriminatory nature of its practices is well-known to Local 52 and its leadership. Local 52 and its officers have intentionally maintained these practices for discriminatory purposes. Upon information and belief, those discriminatory practices are also well-known within the labor market in New York City and have discouraged Hispanic and non-whites from seeking union work and union membership.

19. Local 52 has imposed barriers to union membership with the purpose and effect of excluding Hispanics and other persons of color from membership. Those barriers include the subjective and unequal application of criteria for taking membership exams, thereby delaying or denying admission of Hispanic and other persons of color and otherwise deterring Hispanics and other persons of color from seeking membership.

20. On information and belief, Local 52 officers have decided who would be admitted to Local 52 membership on subjective and discriminatory grounds, rather than objective decisions based upon achieving passing scores on the written and practical exams. Nor were the written and practical exams designed to measure knowledge and skills needed to perform the job upon obtaining membership. Local 52 excluded Gonzalez from membership, like other non-white and Hispanic applicants, despite his having performed the set dresser job satisfactorily over the course of several years. Gonzalez also supervised Union and non-Union workers on the job, but was still excluded from membership.

21. Plaintiff has information and reason to believe that Local 52 has waived exams and other prerequisites to membership on grounds that have been discriminatory on the basis of

6

race and national origin and that have had a disparate impact upon membership opportunities for Hispanics and other persons of color.

22. Further, Local 52 has not delayed the admission into membership of white candidates on the same basis as Hispanic candidates and other persons of color. Local 52 has maintained practices that favor whites, including friends and family of incumbent members, in the application and membership screening processes, with fewer restrictions imposed upon them than upon Hispanic and non-white candidates.

23. Gonzalez first applied for the opportunity to take the membership exams in or about June 2009. The written exam was scheduled to be given on or about August 9, 2009, and he applied by submitting the required paperwork and the $750 application fee. His application for membership followed a conversation with Union officer Peter Ilardi, who advised Gonzalez that he should apply for membership and "you should not have any problems."

24. Local 52 advised Gonzalez in writing that his application to take the membership exams was denied because he lacked sufficient experience in the film industry in a craft under the jurisdiction of Local 52. Yet Union officials, including Peter Ilardi and Dick Tice, were personally aware that Gonzalez had substantial experience in the industry based upon his work on Local 52 productions. Tice was Gonzalez's supervisor on a production in 2006, thereby making Tice personally familiar with Gonzalez's work. At the time of his application to take the August 2009 exams, Gonzalez had more than 3,780 hours of experience as a set dresser in the moving picture industry including work experience as a foreman. Upon information and belief, Tice and other Union officers participated in the decision to deny Gonzalez the opportunity to take the membership exams scheduled for August 2009.

7

25. Subsequently, in response to Plaintiff's EEOC charge (filed on or about June 28, 2011), Local 52 falsely asserted to the EEOC that it had denied Gonzalez the opportunity to take the August 2009 exams because Gonzalez "only showed 13.7 hours of work" contributed into the Motion Picture Industry Pension & Health Plans. This was demonstrably false and a pretext for Local 52's discriminatory conduct. Gonzalez had performed many times more than 13.7 hours working under Dick Tice's supervision in 2006 and Tice and other Union officers were well aware of Gonzalez's substantial work experience.

26. Upon information and belief, non-Hispanic and white applicants were permitted to take the August 2009 exams and/or were admitted into Local 52 with less work experience as set dressers than Gonzalez, including but not limited to family members and friends of the predominantly-white, non-Hispanic incumbent union membership of Local 52.

27. Gonzalez sought, and was denied, the opportunity to take the membership exams in April 2010. Prior to applying, Gonzalez spoke to Defendant Dick Tice regarding the denial of his prior application, and Tice told him that he knew Gonzalez had worked a lot and that everything would be okay as to his application the next time.

28. Gonzalez again submitted the requisite paperwork and $750 application fee, and on this occasion, he spoke with Local 52 Defendant Ray Fortune regarding his application prior to its submission. Fortune reviewed his application and told him it would be okay.

29. By letter dated March 1, 2010, Defendant Local 52 advised Gonzalez that his application had been rejected because of his "lack of sufficient experience in the film industry in a craft under the jurisdiction of Local 52." This assertion was demonstrably false, in light of his more than 3,700 hours of work in the film industry in a craft under the jurisdiction of Local 52.

Upon information and belief, Defendant Tice and other Union officers participated in the decision to deny Gonzalez the opportunity to take the membership exams scheduled for April 2010.

30. Defendant Local 52 subsequently asserted, in its position statement to the EEOC, that Gonzalez was denied the opportunity to take the exams in April 2010 because "he was unable to provide a valid driver's license, had no proof of residence, had no resume, and the number of hours contributed to the Motion Picture Industry Pension Fund totaled only 60 hours." These statements, too, are pretexts for Defendant's discriminatory conduct.

31. Upon information and belief, non-Hispanic and white applicants were permitted to take the April 2010 exams and admitted into the union with less experience as set dressers than Gonzalez, and without the conditions to membership imposed upon Gonzalez. These individuals included, but were not limited to, family members and friends of the white incumbent union members.

32. After again being denied the opportunity to take the April 2010 membership exams, Gonzalez spoke with Union officers Peter Ilardi and Defendant Dick Tice as to why he had been denied membership, given assurances that he should not expect any problems. Neither provided Gonzalez with an explanation and Tice did not return his phone calls.

33. Subsequent to receipt of the March 1, 2010 letter denying his application, Local 52 member Steve Finkin told Gonzalez that he had spoken to Defendant John Ford and learned that Local 52 had not permitted Gonzalez to take the April 2010 exams because of its assertion that a background check showed he had been using "false Social Security numbers" and that he was probably an "illegal alien."

10421764_5.doc

34. Gonzalez spoke with Union officials to contest these assertions, including Defendant Fortune, and on or about May 4, 2010, Gonzalez emailed to Defendant Ford documents showing that he had not been using false Social Security numbers, but rather, his two sons and Gonzalez all had their own Social Security numbers and had each previously performed Local 52 work. Ford never responded to the email, although Local 52 repeated the false allegation to the EEOC in 2011 during the course of its investigation.

35. In or about June 2010 Gonzalez learned that Local 52 was planning to admit white employee Malcolm Sonsire into the Union without requiring him to pass, or even take, the membership exams. Sonsire was less experienced than Gonzalez and Gonzalez had been his supervisor on the production of the TV show, "Royal Pains." In June 2010, Gonzalez spoke to Defendant Ford concerning Local 52's more favorable treatment of Sonsire. Gonzalez told Ford he believed it was unfair for Local 52 to treat Sonsire, a white employee with less experience than Gonzalez, more favorably.

36. Upon information and belief, Sonsire's admission was delayed as a result of Gonzalez's complaint to Ford, but Sonsire was subsequently admitted to union membership.

37. During this time period and later, Gonzalez spoke to other Union officers and Union members regarding his belief that he and other Hispanics and non-whites were treated differently on the basis of national origin and race.

38. Gonzalez filed a third application to take the membership exams – this time, for the August 2010 exams. On this occasion, after submitting his paperwork and $750 fee, and not hearing from Local 52, Gonzalez contacted the Union office and spoke with Local 52 Secretary-Treasurer William McGavin. McGavin stated that Gonzalez had not been permitted to take the

10

exams because there was no application on file. McGavin acknowledged, however, that Local 52 was in possession of Gonzalez's $750 check. McGavin advised Gonzalez that he would be permitted to take the next exams and that Local 52 would retain his deposit and apply it to his January 2011 application. Gonzalez spoke to Defendant Ray Fortune about the Union's failure to permit him to take the exams on this occasion, and Fortune told him there was nothing he could do.

39. In its subsequent statement to the EEOC, Local 52 contended that Gonzalez's application to take the August 2010 exams was rejected because he failed to provide a copy of his driver's license with his application. This assertion is inconsistent with Local 52's prior statement that Gonzalez had been unable to take the exams because his application was not on file.

40. Upon information and belief, non-Hispanic and white employees were not required to produce a driver's license in order to gain union membership. Further, upon information and belief, a requirement of a driver's license or state-issued ID for proof of residency disparately impacts Hispanics and non-whites and is not justified by business necessity.

41. Gonzalez contacted Defendant John Ford twice in November 2010 to discuss further his concerns about the Union's failure to admit him to membership and twice scheduled meetings which did not occur because Ford did not appear for either meeting.

42. Gonzalez applied in early 2011 to take the April 2011 exams. On this occasion, Gonzalez spoke with Union official Barbara Kastner who told him she thought he was "in already," and that his having a Florida driver's license simply meant he needed to submit some

11

other proof of residency. Gonzalez gave to Kastner and McGavin copies of his electric bill, oil bill and cable bill. He also faxed them a copy of the deed to his house showing a purchase date of 2010. After receipt of these documents, Kastner told Gonzalez that everything was in order.

43. By letter dated February 11, 2011, Local 52 advised him that his application was rejected "because of your proof of residency within the jurisdiction of Local 52." Gonzalez was, at that time, residing in Pennsylvania and New York—both within the jurisdiction of Local 52. He tried to reach Defendant Tice to discuss this rejection, but Tice did not return his calls. Upon information and belief, Tice and other Union officers participated in the decision to deny Gonzalez the opportunity to take the membership exams scheduled for April 2011.

44. Subsequently, Local 52 stated to the EEOC that his application was rejected because his "driver's license had been issued by the State of Florida." Upon information and belief, non-Hispanic and white employees, and employees who had not opposed Local 52's discriminatory practices, were permitted to take the membership exams without presentation of a driver's license from New York or other states within Local 52's jurisdiction. Others were permitted to remain in the union without possession of a New York driver's license or even residing within New York or Pennsylvania.

45. Gonzalez also telephoned Defendant Ford in or about February 2011 to discuss Local 52's favored treatment of white, non-Hispanic candidates for membership, including Sonsire, saying he did not believe it was fair that Sonsire, a white employee whose work Gonzalez had supervised, had been offered more favorable treatment.

46. On June 28, 2011, Gonzalez filed a complaint of discrimination and retaliation with the Equal Employment Opportunity Commission.

12

47. Gonzalez experienced an extended period without being permitted to work in Local 52's jurisdiction following his opposition to Local 52's discriminatory treatment of his applications for union membership. Lead men who had previously called Gonzalez regularly for work with them on projects, including Bruce Gross, Phil Canfield, Peter DeCurtis, Bryan Walsh and Jennie Walsh, told him that he needed to go through the union hiring hall, and if the hiring hall did not refer him, they could not hire him. He had not previously been required to do so. Upon information and belief, whites, non-Hispanics and persons who had not opposed discriminatory practices were not treated in this manner.

48. For the 2010 year, he had no earnings that were obtained through Local 52 referrals, and in 2011 and 2012 his earnings were substantially reduced from his earnings in years prior to his opposition to discriminatory practices, despite his continuous efforts to find work. Upon information and belief, Local 52 referred persons who were white or non-Hispanic, and persons who had not opposed discriminatory practices, for work assignments and as a consequence, many had substantial earnings throughout this period.

49. Despite other union and non-union employees obtaining work throughout this period, Gonzalez was unable to find work either through lead men who had previously hired him, contacts with other Union members or through Local 52 referrals. From approximately March 2010 through September 2011, Gonzalez regularly advised Local 52 officials, by phone or email, of his availability for work.

50. In September 2011, Gonzalez received a letter from counsel for Local 52 (dated May 10, 2011) telling Gonzalez, under threat of civil or criminal penalties, to cease and desist from sending daily emails to Local 52 requesting employment, and to seek employment "through

13

[Gonzalez's] own efforts." Upon information and belief, white employees and non-Hispanic employees as well as persons who had not opposed discriminatory practices, were not subjected to such treatment.

51. Subsequently, in or about September 2011, Gonzalez approached Peter DeCurtis, the lead man for the film "Disconnect," and DeCurtis hired Gonzalez as the "on set" set dresser after Plaintiff showed him the letter stating that Gonzalez should seek employment through his own efforts. After working on the job for approximately one month, Local 52 officials learned of Gonzalez's employment on the "Disconnect" production and, upon information and belief, directed the termination of his employment there. Upon information and belief, other non-Union employees remained on the job after Gonzalez's removal.

52. In October 2011, lead man Eugene Melvin, for whom Gonzalez had previously worked, sought to hire set dressers for the cable TV series "Rookies." Plaintiff has information and a reasonable belief that no Union members were available at that time, and Melvin sought to hire Gonzalez. However, upon information and belief, Defendant Ray Fortune did not approve the hiring of Gonzalez and as a consequence, he was not hired.

53. Upon information and belief, while on the set of "Rookies," Defendant John Ford warned Melvin that he should not assist Gonzalez and that he should not have encouraged Gonzalez to get a lawyer to assist him with his discrimination complaint.

54. In or about January—March 2012, upon learning that the union-member referral list was empty and that Local 52 was referring permit workers for work, Gonzalez sought employment on his own with a variety of lead men with whom he had worked previously – as directed by Local 52's attorney's letter to Gonzalez. However, several lead men told him that he

had to go through the Union to be hired and/or that because of their fear of retaliation from the Union, they would not hire him. Others told him that they needed authorization from Local 52 officials before they would hire him and that the letter from the Union directing him to find his own work was insufficient. Upon information and belief, white and non-Hispanic non-Union members, as well as persons who had not opposed discriminatory practices, obtained work during this and other time periods when Gonzalez was unsuccessful.

55. During this period, Gonzalez advised Defendant Ray Fortune by email on several occasions that various lead men had told him that they would hire Gonzalez if Fortune gave his approval. Fortune never responded to these emails. For example, on or about March 30, 2012, Gonzalez advised Fortune by email that two lead men, Matt Gamiello and Brian Walsh, had told him that they had work and would hire him if Defendant Fortune gave his approval. Fortune never responded to Gonzalez's email and Gamiello later advised Gonzalez that Fortune had spoken to him and made statements to him that caused him not to hire Gonzalez.

56. In March 2013, Gonzalez was able to find employment for the production of "The Carrie Diaries" by showing a copy of the Local 52 letter directing him to seek work on his own to lead man Chris Nelson. After being on the job several weeks, Nelson advised Gonzalez that, while he wanted to keep him, he was being let go at the direction of Local 52 personnel. Plaintiff has information and a reasonable belief that he would have been employed for several additional weeks but for Local 52's intervention.

57. Throughout the 2008—2013 period, upon information and belief, Local 52 admitted into Union membership white, non-Hispanic applicants who were less experienced and who were not subjected to the same membership conditions as Gonzalez was prior to admission.

Upon information and belief, some individuals were not required to take the exams at all, had little or no set dresser work experience and/or did not reside inside the Local 52's geographic area of jurisdiction.

58. The actions complained of herein were taken with discriminatory intent and in reckless disregard of Gonzalez's rights under applicable law.

59. Had Local 52 admitted Gonzalez to membership, or continued to offer him employment opportunities in a non-discriminatory and non-retaliatory manner, he would not have suffered the periods of unemployment, and would not have been compelled to look for a career elsewhere. Further, he could have continued to work as a set dresser even while transitioning to work elsewhere if he had chosen to do so.

60. Because of Local 52's discriminatory and retaliatory conduct, upon information and belief, Gonzalez's earnings continue to be far below those of white and non-Hispanic members admitted to Union membership at the time his applications were denied, and lower than permit workers who have not faced discriminatory and retaliatory treatment.

61. As a consequence of Local 52's discriminatory actions, Gonzalez suffered the loss of income, health insurance coverage, pension benefits and other fringe benefits accompanying Union membership and/or performance of Union-related work, and was unable to pay his bills on a regular basis. In addition, he has faced and continues to face the risk of foreclosure of the mortgage loan on his home in Pennsylvania resulting from the loss of income he suffered from Local 52's discriminatory and retaliatory conduct.

10421764_5.doc

62. As a result of the persistent discrimination and retaliation against Gonzales, and his resulting inability to find work and the fear of foreclosure on his house, Plaintiff experienced anxiety, emotional distress, inconvenience, humiliation, pain and suffering.

63. His high levels of stress contributed to conditions that led to heart surgery and Gonzalez has incurred substantial health care costs as a direct consequence of Local 52's discriminatory and retaliatory actions.

64. These discriminatory and retaliatory actions have deterred Gonzalez from continuing to pursue employment opportunities with Local 52. In light of Local 52's exclusionary practices, Gonzalez sought employment opportunities elsewhere in 2013, studying for and gaining membership in United Scenic Artists Local 829 of IATSE in May 2013.

## AS AND FOR A FIRST CAUSE OF ACTION
## (AGAINST DEFENDANT LOCAL 52)

65. Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 64 above, as if fully set forth herein.

66. The actions of Defendant Local 52 as set forth above constitute discrimination based on race, national origin, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

## AS AND FOR A SECOND CAUSE OF ACTION
## (AGAINST ALL DEFENDANTS)

67. Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 64 above, as if fully set forth herein.

10421764_5.doc

68. The actions of Defendants as set forth above constitute discrimination based on race, national origin, and retaliation in violation of 42 U.S.C. § 1981.

### AS AND FOR A THIRD CAUSE OF ACTION
### (AGAINST ALL DEFENDANTS)

69. Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 64 above, as if fully set forth herein.

70. The actions of Defendants as set forth above constitute discrimination based on race, national origin, and retaliation in violation of the New York Executive Law §§ 290 and 296.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (AGAINST ALL DEFENDANTS)

71. Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 64 above, as if fully set forth herein.

72. The actions of Defendants as set forth above constitute discrimination based on race, national origin, and retaliation in violation of the New York City Administrative Code §§ 8-101, et seq.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

73. That the Court enter an order adjudging and declaring that the acts complained of herein constitute violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, the New York State Human Rights Law,

New York Executive Law §§ 290 and 296, and the New York City Administrative Code §§8-101, et seq.;

74. That the Court award Plaintiff back pay including pension benefits and other fringe benefits equal to the difference between the amount he would have earned absent Defendants' unlawful discrimination and the amount he actually earned, including pre-judgment interest;

75. That the Court award compensatory damages in an amount sufficient to make Plaintiff whole for his economic losses he suffered as a consequence of Defendants' unlawful conduct;

76. That the Court award compensatory damages in an amount sufficient to make Plaintiff whole for his mental and emotional distress, humiliation and anguish he suffered as a result of Defendants' unlawful conduct;

77. That the Court enter an order awarding Plaintiff punitive damages in an appropriate amount in light of Defendants' actions taken in willful disregard of Plaintiff's rights, including retaliation against him for opposing Defendants' unlawful practices and his filing charges of discrimination;

78. That the Court order Local 52 to admit Gonzalez to Local 52 membership;

79. That the Court enjoin the Defendants from further acts of discrimination on the basis of race, national origin and opposition to discriminatory practices, in the application of Local 52's admission policies and practices and order the Defendants to establish non-discriminatory criteria for admission to membership, adopt procedures to assure non-

discriminatory application of those criteria and report to the Court on the steps Defendants have taken to comply with the Court's order;

80. That the Court grant Plaintiff an award of reasonable attorneys' fees and costs from Defendants; and

81. That the Court order such other and further relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

82. Plaintiff hereby demands a trial by jury in this action.

Dated: May 30, 2014
New York, New York

                                  LEVY RATNER, P.C.

By:   Robert H. Stroup
      Richard A. Levy
      Attorneys for Rafael Apache
        Gonzalez
      80 Eighth Avenue
      New York, New York 10011
      (212) 627-8100
      (212) 627-8182 (fax)
      rstroup@levyratner.com
      rlevy@levyratner.com